IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| BUDDY P. KAMAKEEAINA, | ) | CIV. NO. 11-00770 JMS/RLP |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING DEFENDANTS' |
| | ) | MOTIONS FOR SUMMARY |
| vs. | ) | JUDGMENT AND DENYING |
| | ) | PLAINTIFF'S MOTION FOR |
| CITY AND COUNTY OF | ) | PARTIAL SUMMARY JUDGMENT |
| HONOLULU, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

Before the court is (1) Department of Public Safety Defendants' Tom

W. Leland, M.D., and Peter Y. Yamato, M.D., ("DPS Defendants") Motion for

Summary Judgment, Doc. No. 125; (2) Honolulu Police Department Defendants'

Tyler Maalo, Nathan Patopoff, William Daubner, Oscar Willis, and Randall Rivera

("HPD Defendants") Motion for Summary Judgment, Doc. No. 138; and (3) pro se

Plaintiff Buddy Kamakeeaina's Motion for Partial Summary Judgment, Doc. No.

141.

Plaintiff complains about incidents that allegedly occurred during his

arrest and detention by the Honolulu Police Department ("HPD") between April 30

and May 3, 2010, and during his incarceration at the Oahu Community Correctional Center ("OCCC") between May 3, 2010, and April 19, 2011.[1] Plaintiff alleges that HPD Defendants failed to take him to a hospital after his arrest despite their knowledge that he had threatened suicide. He also alleges DPS Defendants failed to provide him adequate mental health care after his transfer to OCCC.

A hearing was held on March 17, 2014, at which the court requested supplemental briefing from DPS Defendants. *See* Doc. No. 177. For the following reasons, the court (1) GRANTS HPD and DPS Defendants' Motions for Summary Judgment; and (2) DENIES Plaintiff's Motion for Partial Summary Judgment.

## II. <u>BACKGROUND</u>[2]

### A. Procedural History

Plaintiff commenced this prisoner civil rights action on December 19, 2011, pursuant to 42 U.S.C. § 1983. Compl., Doc. No. 1. On March 29, 2012, the court dismissed the Complaint for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915(A)(b)(1), with leave granted to amend. *See* Order, Doc.

---

[1] Plaintiff transferred from OCCC to the Federal Detention Center-Honolulu ("FDC-Honolulu") in April 2011, and to the Halawa Correctional Facility ("HCF") in August 2012, where he remains.

[2] For clarity, the court refers to the CM/ECF electronic pagination of all documents.

No. 12.

On June 6, 2012, Plaintiff filed the First Amended Complaint ("FAC"). Doc. No. 18. On July 31, 2012, the court dismissed Plaintiff's claims against the State of Hawaii, the City and County of Honolulu ("C&C"), Tulia Pula, Malcolm Lee, Wesley Mun, and Jodie Maesaka-Hirata, as well as claims asserted against all Defendants under the Equal Protection Clause, the Americans With Disabilities Act ("ADA"), and the Rehabilitation Act, with prejudice. *See* Order, Doc. No. 24. Plaintiff's remaining Eighth and Fourteenth Amendment claims against Defendants Rivera, Maalo, Patopoff, Daubner, Willis, Leland, and Yamamoto were served. *Id.*, PageID #498.

Approximately one year later, on July 2, 2013, Plaintiff moved for reconsideration of the dismissal with prejudice of the State of Hawaii, the C&C, Maesaka-Hirata, Mun, Pula, and claims asserted under the Equal Protection Clause, the ADA, and the Rehabilitation Act. Mot., Doc. No. 107. On August 6, 2013, this court denied Plaintiff's motion for reconsideration. *See* Order, Doc. No. 108. Plaintiff immediately moved again for reconsideration, which was again denied. Objection, Doc. No. 109; Order, Doc. No. 110.

///

///

3

**B.      Remaining Claims**

Plaintiff alleges that HPD Defendants observed signs of his mental instability and suicidal ideation before and during his arrest on Friday evening, April 30, 2010, yet failed to take him to the Queen's Medical Center or an equivalent hospital for a mental health evaluation and care as he alleges is required by Hawaii Revised Statutes ("HRS") § 334-59(a)(1).  FAC, Doc. No. 18, PageID #441.  Instead, HPD Defendants took Plaintiff to the HPD Central Receiving Division ("CRD"), where he remained for two and a half days until his transfer to OCCC on Monday, May 3, 2010.  Plaintiff asserts this constitutes deliberate indifference to his obvious need for mental health care, in violation of the United States and Hawaii Constitutions and HRS § 334-59(a)(1).  *Id.*, PageID #441-43.

Plaintiff next alleges that DPS Defendants Dr. Leland and Dr. Yamamoto denied him adequate mental health care during his incarceration at OCCC from May 3, 2010 to April 19, 2011, by failing to accurately diagnose and treat his mental health problems.  *Id.*, PageID #449-50.  Plaintiff states that he notified Dr. Leland and Dr. Yamamoto and other DPS officials of his longstanding mental health issues and diagnoses, and requested specific mental health care, including antipsychotic medication and therapy, but they denied his requests with deliberate indifference to his serious needs.  *Id.*

## C.     Prayer for Relief

Plaintiff seeks injunctive relief requiring the State of Hawaii and the

DPS to formally recognize his mental illnesses and provide him mental health

treatment, including psychotropic medication and therapy, at all Hawaii

correctional facilities where he may be incarcerated, now and in the future.  *Id.*,

PageID #453.  Plaintiff also seeks compensatory and punitive damages.

## III.  LEGAL STANDARDS

## A.     Summary Judgment

Summary judgment is proper when there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who

fails to make a showing sufficient to establish the existence of an element essential

to the party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party "bears the initial burden of informing the court of

the basis for its motion and of identifying those portions of the pleadings and

discovery responses that demonstrate the absence of a genuine issue of material

fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing

*Celotex*, 477 U.S. at 323).  Material used to support or dispute a fact must be

"presented in a form that would be admissible in evidence." Fed. R. Civ. P.

56(c)(2). Affidavits or declarations submitted in support of or in opposition to a

motion "must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to

testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

If the moving party carries its burden, the non-moving party "must do

more than simply show that there is some metaphysical doubt as to the material

facts [and] come forward with specific facts showing that there is a genuine issue

for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87

(1986) (citation and internal quotation signals omitted); *see also Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest

upon the mere allegations or denials of his pleading"). The opposing party need

not conclusively establish a material issue of fact, but need only show that the

factual dispute "require[s] a jury or judge to resolve the parties' differing versions

of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809

F.2d 626, 631 (9th Cir. 1987). "A mere scintilla of evidence is insufficient to

create a material question of fact and defeat a motion for summary judgment;

'there must be evidence on which the jury could reasonably find for the

[non-movant].'" *CareToLive v. FDA*, 631 F.3d 336, 340 (6th Cir. 2011) (quoting

*Anderson*, 477 U.S. at 252 ).  "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law."  *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248).

When considering the evidence, the court must draw all reasonable inferences on behalf of the nonmoving party.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor" (citations omitted)).

## B.     Qualified Immunity

Government officials are entitled to qualified immunity from civil damages unless their conduct violates clearly established statutory or constitutional rights.  *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001).  When considering a qualified immunity defense, the court must decide: (1) whether the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was "clearly established."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  While

this sequence for review is often appropriate, it is not mandatory. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If a plaintiff's allegations do not make out a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. Or, if the court determines that the right at issue was not clearly established at the time of the defendant's alleged misconduct, the court may end the qualified immunity inquiry at that point without determining whether the allegations make out a statutory or constitutional violation. *Pearson*, 555 U.S. at 236-242.

"A [g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, — U.S. —, —, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*; *see also Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) ("The proper inquiry focuses on . . . whether the state of the law [at the relevant time] gave 'fair warning' to the officials that their conduct was unconstitutional.") (quoting *Hope v. Pelzer*, 536 U.S. 730, 731 (2002)). The inquiry "must be undertaken in light of the specific context of the [particular] case,

not as a broad general proposition. . . ." *Saucier*, 533 U.S. at 201. "Officers are entitled to qualified immunity if they reasonably misapprehend how the law would govern in their particular situation." *Conn v. City of Reno*, 591 F.3d 1081, 1102 (9th Cir. 2010), *vacated*, — U.S.—, 131 S. Ct. 1812 (2011), *reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011). Because qualified immunity is an affirmative defense, the burden of proof initially lies with the official asserting the defense. *Harlow v. Fitzgerald*, 457 U.S. 800, 812 (1982).

## IV. <u>DISCUSSION</u>

### A. **Procedural Due Process, Equal Protection, ADA, Rehabilitation Act, and Excessive Force Claims**

In his Oppositions to HPD and DPS Defendants' Motions for Summary Judgment, Plaintiff references their alleged violations of "procedural due process," the ADA, the Rehabilitation Act, and HPD Defendants' alleged use of excessive force during his arrest. As noted above, the court dismissed Plaintiff's Equal Protection, ADA, and Rehabilitation Act claims with prejudice and denied reconsideration on this issue twice. *See* Orders, Doc. Nos. 24, 108, 110. Plaintiff may not relitigate that decision here.

To the extent Plaintiff attempts to amend his pleadings to set forth an excessive force claim against HPD Defendants, that request is DENIED. Plaintiff concedes he never raised this claim in the original Complaint or the FAC. He

provides no coherent argument supporting this claim, and the record, viewed in the light most favorable to Plaintiff, contains no facts supporting a finding that HPD Defendants used excessive force during his arrest or detention.

Plaintiff's "procedural due process" argument is unclear. He may simply be claiming that his Fourteenth Amendment substantive due process rights as a pretrial detainee were violated.[3] That issue is discussed below. To the extent Plaintiff raises a procedural due process claim against the DPS Defendants regarding the denial of his grievances, prison officials' alleged failure to utilize Offendertrak, or regarding his ADA claims, the court has rejected those claims and they remain dismissed.

## B.    Plaintiff's Request For Permanent Injunctive Relief Is Dismissed

Plaintiff complains about the conditions of his confinement at OCCC while he was a pre-trial detainee in 2010 and seeks permanent injunctive relief requiring DPS to recognize his mental illness and provide him mental health treatment, including psychotropic medication and therapy, at all Hawaii correctional facilities where he may be incarcerated, now and in the future. It is undisputed that Plaintiff transferred from OCCC in April 2011, that he received the

---

[3] Plaintiff was a pretrial detainee until August 28, 2010, when his probation was revoked in Cr. No. 1PC-08-1-1539. *See* http://hoohiki1.courts.state.hi.us/jud/Hoohiki. Plaintiff pled no contest to two charges in Cr. No. 1PC10-1-000729 on March 17, 2011. *Id.*

mental health care he sought at the FDC-Honolulu, and continues to receive it at HCF.

Plaintiff's request for injunctive relief is moot. "When an inmate challenges prison conditions at a particular correctional facility, but has been transferred from the facility and has no reasonable expectation of returning, his claim is moot." *Pride v. Correa*, 719 F.3d 1130, 1138 (9th Cir. 2013) (citing *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991)). In such circumstances, the inmate's claim is moot because he "no longer is subjected to [the allegedly unconstitutional] policies." *Johnson*, 948 F.2d at 519; *see also Dilley v. Gunn*, 64 F.3d 1365, 1372 (9th Cir. 1995) (concluding that prisoner's claim that he might be transferred back to first prison in the future was too speculative).

Moreover, Plaintiff's request is foreclosed by the Prison Litigation Reform Act of 1995 ("PLRA"). The PLRA requires that prospective relief in civil actions related to prison conditions "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2); *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1203 (9th Cir. 2008) ("The PLRA both limits the prospective relief a court may order in [civil actions challenging prison conditions], and authorizes the termination of relief that does

not fall within those limits.").  Plaintiff's request goes far beyond correcting the potential harm he alleges he faces.  Rather, Plaintiff seeks reassurances that he will always receive a certain level of mental health care that satisfies him in perpetuity.  This request is DISMISSED under the PLRA as overbroad and extending beyond the harm Plaintiff claims he suffered at OCCC.

## C.    HPD Defendants' Motion for Summary Judgment

HPD Defendants assert they had no legal duty or ability to provide Plaintiff mental health care before his arrest, no reason to believe he required immediate mental health care thereafter, and Plaintiff fails to show harm from any delay in care while he was in their custody.  They argue (1) they are entitled to qualified immunity for Plaintiff's federal claims; (2) Plaintiff fails to state a claim under HRS § 334-59; and (3) Plaintiff's state law claims are otherwise barred by the state doctrine of conditional privilege.

Plaintiff counters that HPD Defendants clearly understood that he was at a heightened risk of suicide when they encountered him, yet acted with deliberate indifference when they failed to take him to a hospital for a mental health evaluation and care upon his arrest in violation of state and federal law.

///

///

### 1.    *Relevant Undisputed Facts and Background*

HPD Defendants Maalo, Patopoff, Daubner, Willis, and Rivera responded to a domestic disturbance at the Queen Emma Gardens apartment complex on Friday, April 30, 2010, at approximately 8:40 p.m.  *See* HPD Defs.' Concise Statement of Facts ("CSF"), Doc. No. 139 ¶¶ 1-2.  None of HPD Defendants had any previous information, contact, or interactions with Plaintiff. *See id.* ¶ 42.

When Patopoff and Maalo entered the apartment building they found Daubner crouching next to Amanda Krugh, who was laying on the floor outside of Apartment #1442, bleeding from wounds to her hand and face.  *Id.* ¶ 3.  Krugh, her neighbor Dorothy Smith, and the apartment security officer informed them that Plaintiff was the assailant, was inside apartment #1442, and was possibly armed with a knife.  *Id.* ¶ 4.  Smith and Krugh also related that Plaintiff was suicidal.  *See* Doc. No. 163-9, Patopoff Aff., PageID #1942; Patopoff Incident Report, PageID #1953; Willis Incident Report, PageID #1965; CID Closing Report, PageID #1968 ("A witness, Dorothy SMITH, related . . . a male was inside . . . ready to commit suicide with a knife.").

The officers drew their weapons (including guns and tasers) and entered the apartment.  HPD Defs.' Ex., Doc. No. 139 ¶ 5.  They found Plaintiff on

a balcony that was barricaded with boxes, trash, and other objects. *Id.* ¶ 6. As

Patopoff and Maalo approached, Plaintiff climbed over the railing and threatened

to jump if they came closer. *Id.* ¶ 8. Maalo attempted to coax Plaintiff back onto

the balcony; Plaintiff retreated further. *Id.* ¶¶ 9-10. Because they could see

Plaintiff was unarmed and posed no threat, the officers holstered their weapons.

*Id.* ¶ 8.

Maalo, Willis, Rivera, and others tried to convince Plaintiff to step

back from the ledge. *Id.* ¶ 11. The apartment smelled of alcohol and Plaintiff

appeared intoxicated. Maalo Decl., Doc. No. 139-1 ¶¶ 12-13. Plaintiff yelled that

he was prepared to die, told Maalo that he would be the last person to see him

alive, and "repeatedly stated that he [had been] trying to kill himself and [Krugh]

got in the way and tried to stop him." *Id.* ¶ 10; Maalo Statement, PageID #1945.

Although Plaintiff appeared upset and intoxicated, he coherently

responded to the HPD Defendants' questions throughout the incident. Rivera

Decl., Doc. No. 139-5 ¶ 17; Patopoff Decl., Doc. No. 139-2 ¶ 4. Other than two

brief threats that he would jump from the balcony if the officers drew near,

Plaintiff made no other suicidal threats in their presence. Rivera Decl., Doc. No.

139-5 ¶ 17; Patopoff Decl., Doc. No. 139-2 ¶ 21; Willis Decl., Doc. No. 139-4 ¶ 6.

They attributed Plaintiff's statements that he would jump if they approached as

declarations made to evade arrest. *See* Maalo, Patopoff, Daubner, Willis Decls., Doc. Nos. 139-1 to 139-5.

After approximately one hour, Plaintiff surrendered. He opened the window of the adjacent apartment, #1440, entered, and quietly waited until the HPD Defendants entered. Doc. No. 139 ¶¶ 12-13. Plaintiff then lay on the floor and allowed Patopoff to handcuff him without incident. *Id.* ¶ 15. Patopoff arrested Plaintiff at approximately 9:40 p.m. *Id.* ¶ 12. Maalo, Daubner, Willis, and Rivera had no further contact with Plaintiff. At 10:10 p.m., Patopoff took Plaintiff to HPD CRD. *Id.* at ¶ 17. They arrived within five minutes without incident. *Id.* ¶¶ 24-25.

Patopoff states that HPD policy requires that "every arrestee is asked by CRD personnel whether they are sick, injured, taking prescription medication, or have to go to the hospital for any reason." Patopoff Decl., Doc. 139-2 ¶ 19. He asserts that he and CRD personnel twice asked Plaintiff if he was injured or required medical attention, but Plaintiff "gave no indication" that he needed such attention. *Id.* ¶¶ 16-18. Maalo's, Patopoff's, and Daubner's police reports, written on the night Plaintiff was arrested, are marked "No injury observed, <u>none reported when asked</u>," indicating Plaintiff was asked whether he needed care at the scene. *Id.*, PageID #1949, #1957, #1963 (emphasis in originals). Plaintiff flatly denies

that he was asked if he needed medical treatment or declined transport to a hospital.  *See* Pl.'s Decl., Doc. No. 161, PageID #1836.

At or about 10:30 p.m., Patopoff apprised CRD Lieutenant M. Frederick of the facts and circumstances of Plaintiff's arrest.  Patopoff Decl., Doc. No. 139-2 ¶ 20.  Frederick then accepted Plaintiff into CRD custody.  The HPD Defendants completed incident reports that evening and had no further contact with Plaintiff.  *See* Doc. No. 163-9.  Plaintiff's arrest report notes that on arrival at CRD he had no apparent injuries, no medical alert, and was not taking medication.  Doc. No. 163-9, PageID #1934.  It also shows that Plaintiff was "Cooperative" at 10:15 p.m. that evening, when he took his first intoxilyzer test, and "calm" the next morning when he took his second.  *Id.*, PageID #1934-35.  Plaintiff did not attempt suicide while in HPD custody.  The record does not indicate any problems that occurred while Plaintiff was at HPD CRD, or that he requested and was denied treatment during that time.  Plaintiff was transferred to OCCC on Monday, May 3, 2010.

### 2.    *Cruel and Unusual Punishment*

A pretrial detainee's protections against cruel and unusual punishment arise under the Due Process Clause of the Fourteenth Amendment, but are evaluated under the Eighth Amendment's deliberate indifference standards.

*See Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010);

*Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1241 (9th Cir. 2010) ("We

have long analyzed claims that correction facility officials violated pretrial

detainees' constitutional rights by failing to address their medical needs (including

suicide prevention) under a 'deliberate indifference' standard."); *Lolli v. Cnty. of

Orange*, 351 F.3d 410, 418-19 (9th Cir. 2003).

   To establish a claim for failure to provide timely or adequate medical

care, a prisoner must show that he suffered from a serious medical need and that

prison officials were deliberately indifferent to that need. *Estelle v. Gamble*, 429

U.S. 97, 106 (1976). In the Ninth Circuit, the test for deliberate indifference

consists of two parts, an objective prong and a subjective prong. *See Clement*, 298

F.3d at 904 (citation omitted); *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1991),

*overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.

1997) (*en banc*). Objectively, a prisoner must show a serious medical need, that is,

a need that involves more than a *de minimis* injury that could result in further

significant injury or the unnecessary and wanton infliction of pain if left untreated.

*Estelle*, 429 U.S. at 104; *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

Subjectively, deliberate indifference requires a purposeful act or failure to respond

to that pain or possible medical need and harm caused by the indifference. *Estelle*,

429 U.S. at 104-05; *Jett*, 439 F.3d at 1096.

### 3.    *Heightened Risk of Suicide Is an Objectively Serious Medical Need*

"A heightened suicide risk or an attempted suicide is a serious medical need." *Conn*, 591 F.3d at 1095; *see also Simmons*, 609 F.3d at 1018 (same). When they arrived at the scene, witnesses told HPD Defendants that Plaintiff was "ready to commit suicide" and they heard him threaten to jump from the balcony. *See* Doc. No. 163-9, Patopoff Aff., PageID #1942; Patopoff Incident Report, PageID #1953; Willis Incident Report, PageID #1965; CID Closing Report, PageID #1968. Plaintiff says he told HPD Defendants that Krugh had gotten in his way as he was attempting to commit suicide. This clearly satisfies the objective component of a serious medical need. *See Conn*, 591 F.3d at 1095.

### 4.    *HPD Defendants Were Not Subjectively Deliberately Indifferent*

Subjectively, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Simmons*, 609 F.3d at 1017-18. A police officer cannot be liable for deliberate indifference unless he or she (1) was aware of the serious medical need *and* (2) failed to adequately respond to that need. *See Conn*, 591 F.3d at 1096; *Simmons*, 609 F.3d at 1017-18 (holding that even knowledge that an inmate is on

18

suicide watch, standing alone, is insufficient to show that a defendant was subjectively aware that the inmate was actively suicidal).  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment."  *Farmer*, 511 U.S. at 838.

Further, the subjective inquiry is not satisfied unless there is "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) *harm* caused by the indifference."  *Jett*, 439 F.3d at 1096 (citing *McGuckin*, 974 F.2d at 1060) (emphasis added).  "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs."  *Id.*  Delay of or interference with medical treatment can only amount to deliberate indifference if the delay led to harm or further injury.  *Id.*; *Hallett v. Morgan*, 296 F.3d 732, 745-48 (9th Cir. 2002) (holding that prison's mental health services met the prisoners basic mental health needs); *Doty v. Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994); *see also McGuckin*, 974 F.2d at 1060.

a.     *HPD Defendants' subjective awareness and response*

It is undisputed that HPD Defendants were unaware of Plaintiff's earlier suicide attempts or history of mental illness when they responded to the

domestic dispute at the apartment.  Although Plaintiff was intoxicated, he did not appear delusional, he coherently responded to their questions, and he was aware of his surroundings.  Based on Plaintiff's demeanor, statements before and after he surrendered, and their experience, HPD Defendants attributed Plaintiff's threats to jump from the balcony as an attempt to avoid arrest rather than a serious suicide threat.[4]  In less than an hour they coaxed Plaintiff into the adjoining apartment where he calmly submitted to arrest without incident.  He had no observable injuries and made no further threats of suicide.  He did not report that he was in pain, or request medical or psychiatric care.[5]  Once Plaintiff was handcuffed and in custody he posed no immediate threat to himself or others.  Their failure to recognize Plaintiff's threats as something more serious, does not constitute cruel and unusual punishment.  *Farmer*, 511 U.S. at 838.

Significantly, when Patopoff took Plaintiff to HPD CRD, he briefed Lieutenant Frederick regarding the circumstances of Plaintiff's arrest.  Patopoff then completed an affidavit in support of the warrantless arrest and an incident report, explicitly noting in both that Plaintiff had threatened to kill himself.  *See*

---

[4] The court does not rely only on HPD Defendants' assertions as to their state of mind, as this is a question of fact for the jury to determine.  *See Conn*, 591 F.3d at 1097.  Rather, the court considers these statements in conjunction with all of the circumstances.

[5] Plaintiff says he was never offered or refused medical attention.  *See* Pl.'s Decl., Doc. No. 161, PageID #1836.  He does not say that he requested such care and was denied.

HPD Defs.' CSF, Doc. No. 139, PageID #1939-43. Maalo, Daubner, Willis, and Rivera also reported Plaintiff's suicide threats in incident reports they completed that night. *See* Doc. No. 163-9, PageID #1944-66. That is, the HPD Defendants explicitly warned CRD personnel about Plaintiff's threats of suicide when they relinquished custody of him.

Their conduct is in stark contrast to the police officers' actions in *Conn*, which Plaintiff cites in support of his claims against HPD Defendants. *See* 591 F.3d at 1092, 1097. In *Conn*, two police officers witnessed the "grossly intoxicated" decedent's suicidal behavior in their vehicle when they transported her to jail for her own protection. *Id.* at 1092. One officer had arrested her before and knew of her mental instability; both had been cautioned about her violent tendencies and precarious mental health before they detained her. *Id.* They saw her wrap a seatbelt around her neck in the transport van, heard her screaming, "Just kill me. I'll kill myself then," stopped the van to handcuff her, commented to each other on her agitation, and discussed whether they should report her suicidal behavior. They discounted her suicide attempt, however, and decided not to report her behavior to jail personnel. *Id.* She was released from civil detention four hours later. The next day, one officer told his superior about his discomfort regarding her behavior the day before in the police van. *Id.* at 1097. The decedent

was arrested the following day and thereafter committed suicide while in custody. That same officer immediately expressed regret that he did not report her suicidal behavior two days earlier. Both officers later testified that they believed she was trying "to manipulate the situation," when she tried to choke herself because she did not want to be taken to jail. *Id.* Based on all of these facts, the Ninth Circuit held that a genuine issue of material fact existed whether the officers were subjectively aware of and failed to adequately respond to the threat of suicide. *Id.* at 1095-98.

As noted, the HPD Defendants had never encountered Plaintiff before, were unaware of his "long-standing" mental health issues, and explicitly notified CRD personnel about his suicidal statements and behavior before they relinquished custody. Based on these uncontested facts, HPD Defendants were not subjectively aware that Plaintiff was at a serious risk of suicide, thus, in immediate need of an emergency mental health evaluation or treatment, and their response to his threats was reasonable. *See Simmons*, 609 F.3d at 1017-18.

b.    *Causation: no further significant injury*

Plaintiff also fails to allege facts or submit evidence showing that he suffered "further significant injury" due to HPD Defendants' failure to take him to a hospital. To maintain a cognizable § 1983 claim, there must be a showing that a

defendant's conscious and deliberately indifferent delay in providing care caused further significant injury. *See, e.g.*, *Jett*, 439 F.3d at 1096; *Hallett*, 296 F.3d at 746 (finding no Eighth Amendment violation where plaintiffs could not demonstrate that delays in dental care caused "problems so severe [as to] cause significant harm and that Defendants should have known this to be the case"); *Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994); *McGuckin*, 974 F.2d at 1059; *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990).

Plaintiff never attempted suicide while in HPD custody or, in fact, at anytime at issue in this suit. The record shows that he was calm and cooperative while at CRD. When he was arrested, Plaintiff was taking no medication and was seeing a therapist only monthly; he admits that he missed his last appointment. *See* Pl.'s Ex. 163-6, PageID #1900-01 (Dr. Robinson 3-panel report). Thus, the few hours that Plaintiff was in the HPD Defendants' custody did not interrupt any ongoing mental health treatment plan or result in further significant injury. Moreover, although Plaintiff names no HPD CRD officers and confines his claims to the evening of his arrest, clearly his weekend detention at CRD did not interrupt the mental health treatment he was receiving or cause him further significant injury.

Plaintiff constructs a tenuous argument that, had HPD Defendants taken him immediately to a hospital, hospital personnel would have "verified" his mental illness, and he would have been treated for such mental illness immediately on arrival at OCCC, rather than having to wait for verification and allegedly appropriate treatment at FDC-Honolulu. This argument is completely speculative and without merit. HPD Defendants reported Plaintiff's suicide threats the night he was arrested, he received a mental health assessment and screening on arrival at OCCC, and another a week later. *See* Pl.'s Exs., Doc Nos. 163-1, 163-2. There was no significant delay in "verifying" Plaintiff's suicidal ideation or past mental health history.

Moreover, OCCC staff psychiatrists Dr. Leland and Dr. Yamamoto verified Plaintiff's mental health history and condition when they examined him on May 18 and September 10, 2010, respectively. *See* Leland Decl., Doc. No. 126-1; Yamamoto Decl., Doc. No. 126-2. Plaintiff's mental health history was further "verified" by three court-appointed mental health professionals while he was still at OCCC. *See* Doc. No. 163-6 (Blinder, Robinson, and Lichton Reports). As discussed *infra*, neither Dr. Leland, Dr. Yamamoto, nor these three mental health professionals reported any significant negative change in Plaintiff's mental health since his initial diagnosis by Dr. Price in 2004. *Compare id.*, *with* Pl.'s Ex., Doc.

No. 163-3 (Eligibility Assessment and diagnosis by Alan D. Price, Ph.D.,

Psychologist). There is no genuine issue of material fact that Plaintiff suffered no

significant harm from HPD Defendants' decision to take him to jail rather than to a

hospital.

<blockquote>

c.      *Violation of state law does not impact 42 U.S.C. § 1983*

</blockquote>

Plaintiff's assertion that HPD Defendants violated his federal

constitutional rights by their alleged violation of HRS § 334-59 also fails. Section

1983 provides relief for violations of the United States Constitution or laws of the

United States. *Hydrick v. Hunter*, 500 F.3d 978, 987 (9th Cir. 2007) (citation

omitted), *vacated and remanded on other grounds*, 556 U.S. 1256 (2009); *accord*

*West v. Atkins*, 487 U.S. 42, 48 (1988). Accordingly, HPD Defendants Maalo,

Patopoff, Daubner, Willis, and Rivera are entitled to qualified immunity from

Plaintiff's § 1983 claims.

### 5.      *No Violation of State Law*

As noted, Plaintiff's primary claim is that HPD Defendants violated

HRS § 334-59, which he alleges prohibits a police officer from "acceptance of an

existing 'imminently dangerous to self or others' situation involving mental health,

mental illness, drug addiction and/or alcoholism related behavior." FAC, Doc. No.

18, PageID #442. At all times relevant to this action, § 334-59 stated in pertinent

part:

(a) Initiation of proceedings. An emergency admission *may* be initiated as follows:

(1) If a law enforcement officer has reason to believe that a person is imminently dangerous to self or others, or is gravely disabled, or is obviously ill, the officer shall call for assistance from the mental health emergency workers designated by the director. Upon determination by the mental health emergency workers that the person is imminently dangerous to self or others, or is gravely disabled, or is obviously ill, the person shall be transported by ambulance or other suitable means, to a licensed psychiatric facility for further evaluation and possible emergency hospitalization. A law enforcement officer *may* also take into custody and transport to any facility designated by the director *any person threatening or attempting suicide*. The officer shall make application for the examination, observation, and diagnosis of the person in custody. . . .

HRS § 334-59(a)(1) (2010 Replacement) (emphasis added).

a.     *No violation of HRS § 334-59*

First, nothing within the statute suggests that an individual has a

private right of action under § 334-59 to compel police officers to initiate an

involuntary emergency mental health examination when they encounter and arrest

an intoxicated suspect to a serious crime of violence. Although Plaintiff was

intoxicated and had admittedly harmed his girlfriend, he did not appear gravely

disabled or obviously ill within the meaning of the statute. *See* HRS § 334-1

(defining the statute's terms). The HPD Defendants did not believe Plaintiff intended to harm himself or had the ability to harm others when they encountered him; they believed he was evading arrest. To uphold such an interpretation of the statute would seriously undermine and constrain the discretion law enforcement must have to effectively perform their jobs and protect the public. Plaintiff submits no case law supporting this proposition and the court is unable to locate any.

Second, once HPD Defendants addressed the immediate situation and Plaintiff was restrained and in their custody, he posed no imminent threat to himself or others. "The statute . . . applies only in emergencies: Hawaii has a separate set of statutes that govern involuntary examination and hospitalization in nonemergency situations. Those statutes require a judicial determination before the authorities may seize and transport a person to a hospital for an involuntary mental examination." *Arekat v. Donohue*, 404 Fed. Appx. 160, 161 (9th Cir. 2010). The emergency ended when Plaintiff calmly surrendered and HPD Defendants had no statutory duty to request an emergency mental health evaluation.

Finally, the statute is explicitly discretionary in cases of threatened suicide. *See* HRS § 334-59(a)(1) ("A law enforcement officer *may* also take into custody and transport to any facility designated by the director any person

threatening or attempting suicide.").  The HPD Defendants were not obligated to take Plaintiff to the hospital because he had threatened suicide, did not violate § 334-59, and are entitled to summary judgment on this claim.

        *b.*    *Negligence*

        To the extent Plaintiff argues HPD Defendants negligently failed to take him to the hospital, they are entitled to the defense of conditional privilege. Under Hawaii law, a nonjudicial governmental official performing a public duty "enjoys the protection of what has been termed a qualified or conditional privilege." *Towse v. Hawaii*, 64 Haw. 624, 631, 647 P.2d 696, 702 (1982); *see also Pahk v. Hawaii*, 109 F. Supp. 2d 1262, 1269 (D. Haw. 2000).  This protection extends to county police officers against negligence claims.  *Ogden ex rel. Estate of Ogden v. Cnty. of Maui*, 554 F. Supp. 2d 1141, 1153 (D. Haw. 2008). Conditional privilege effectively shields state officials from liability if the privilege is not abused and thereby lost.  *Towse*, 64 Haw. at 631, 647 P.2d at 702.  To overcome an assertion of conditional privilege, the injured party must allege and prove by "clear and convincing evidence" that the official was motivated by malice and not by an otherwise proper purpose.  *Id.*  Because a determination of malice is generally for the jury, judgment on conditional immunity grounds is proper only when malice has been removed from the case by uncontroverted affidavits or

depositions. *See id.*

Plaintiff does not plead HPD Defendants were motivated by malice, and the uncontested facts do not show HPD Defendants acted with malice. In fact, Plaintiff does not controvert the HPD Defendants' affidavits stating they were not motivated by malice. HPD Defendants are entitled to conditional privilege immunity against Plaintiff's state law negligence claims.

Accordingly, there is no genuine issue of material fact that HPD Defendants are entitled to qualified and conditional immunity as to all claims alleged against them. HPD Defendants' Motion for Summary Judgment is GRANTED in its entirety.

## D. Plaintiff's Motion for Partial Summary Judgment Is Denied

In light of the discussion above, Plaintiff's Motion for Partial Summary Judgment, seeking dismissal of HPD Defendants' sixteenth affirmative defenses of res judicata and collateral estoppel is DENIED.

## E. DPS Defendants' Motion for Summary Judgment

Plaintiff alleges that DPS Defendants Dr. Leland and Dr. Yamamoto failed to provide him adequate mental health care while he was incarcerated at OCCC between May 3, 2010 and April 19, 2011, violating the Eighth Amendment and HRS § 353-13.3 ("The department shall be responsible for providing mental

health services in community correctional centers"). DPS Defendants assert they provided Plaintiff appropriate mental health care based on their professional opinions and that they are entitled to qualified immunity.

### 1. *Uncontested Facts*

Approximately six years before Plaintiff's arrest on April 30, 2010, Alan D. Price, Ph.D, a licensed psychologist with the Hawaii Department of Health ("DOH") Adult Mental Health Division ("AMHD"), diagnosed Plaintiff as suffering from post-traumatic stress disorder ("PTSD"), Cannabis and Amphetamine Abuse, Amphetamine Induced Mood Disorder, and Antisocial Personality Disorder. *See* Pl.'s Ex., Doc. No. 163-3, PageID #1885-88 (DOH AMHD Eligibility Assessment, dated May 21, 2004). Dr. Price stated that Plaintiff showed "clear indicators of a Bipolar I condition with manic symptoms[,]" but opined that it was unclear whether these symptoms were present prior to Plaintiff's methamphetamine use. *Id.* at PageID #1888. On his report, he noted, "R/O Bipolar I Disorder, Most Recent Episode Mixed."[6] *Id.* At Plaintiff's request, Dr. Price "re-signed" this report on November 10, 2010, although he did not reexamine Plaintiff.

---

[6] R/O is a common medical abbreviation for "rule out." *See* mediLexicon Int'l, avail. at: http://www.medilexicon.com/medicaldictionary.

On or about June 14, 2005, AMDH staff psychiatrist, Donald L. Geil, OD, examined Plaintiff. Pl.'s Ex., Doc. No. 163-5. Plaintiff told Dr. Geil that Dr. Price had diagnosed him with "[PTSD], Chemical Dependency, Antisocial P.D. and Bipolar Disorder," and had found him eligible for state services. Dr. Geil noted that Plaintiff's mood swings and depression had "improved now on Seroquel he takes regularly." *Id.*, PageID #1891. Dr. Geil diagnosed Plaintiff with "[PTSD], chronic by history 309.81; polysubstance abuse; crystal methamphetamine dependence, full sustained remission 304.40," but did not include Bipolar I Disorder in this diagnosis. *Id.*, PageID #1893.

Four years later, on March 11, 2009, the state court sentenced Plaintiff in Cr. No. 1PC08-1-001539. *See* Pl.'s Ex., Doc. No. 163-13. As a mandatory condition for his release on probation, the court ordered Plaintiff to "obtain/maintain mental health treatment." *Id.* PageID #2017. Plaintiff began seeing Rose Clute, A.P.R.N,[7] monthly at the Queen's Medical Center ("QMC") pursuant to this requirement. He missed his April 9, 2010 appointment. *See* Pl.'s Ex. 163-6, PageID #1900-01.

---

[7] "A.P.R.N." is the abbreviation for an accredited advanced practice registered nurse. *See* http://www.nursecredentialing.org/Certification/APRNCorner/APRN-Factsheet.

Plaintiff arrived at OCCC on May 3, 2010. DPS Defs.' CSF, Doc. No. 126-3, PageID #1515. OCCC personnel administered a mental health screening admission assessment that day. Pl.'s Ex., Doc. No. 163-1. Plaintiff reported that he had been diagnosed with "bipolar, PTSD, anti-Social, [and] chemical dependency," had "stopped taking Seroquel meds," and was seeing "Therapist Clute (QMC)." *Id.* at PageID #1853-54. He requested and was given a mental health referral. The assessment notes that Plaintiff had no observable signs of medical or mental health needs. *Id.*

On May 10, 2010, a post-admission mental health assessment was done. *See id.*, Doc. No. 163-2. Plaintiff reported feeling "good," but related that he had received counseling from Dr. Price in 2005, for "Bi-polar, PTSD, Anti-social, Ex [?] & chemical dependency." *Id.* PageID #1855. He said he discontinued taking Seroquel in 2005 after one dose due to its side effects, and took no other medication. *Id.* PageID #1855-56. Plaintiff admitted using alcohol before his arrest, but denied using drugs. *Id.* PageID #1856. He was deemed suitable for general population housing and referred for a psychiatric consult. *Id.*

On May 13, 2010, Plaintiff was seen at the OCCC Psychiatric Clinic for a mental health history. DPS Defs.' Ex., Doc. No 126-3 ("M.H. hx"). On May 18, 2010, Plaintiff met with part-time OCCC psychiatrist Dr. Leland. *Id.*; *see also*

Leland Decl., Doc. No. 126-1 ¶ 2.  Plaintiff told Dr. Leland that prior to his arrest he was (1) participating in therapy with Clute at QMC; (2) active in Alcoholics Anonymous ("AA"); and (3) taking no medication.  *Id.*, Leland Decl., Doc. No. 126-1 ¶ 4.  Plaintiff was alert, cooperative, and related no problems regarding lack of sleep or loss of appetite.  Dr. Leland opined that a Bipolar I Disorder diagnosis was inconsistent with Plaintiff's clinical presentation.  *Id.* ¶ 5.  Because Plaintiff was stable, sober, asserted he had taken no medication for his mental health issues for at least five years, and expressed his intent to continue treatment with Clute and AA upon his release, Dr. Leland determined that prescribing Plaintiff medication was medically inappropriate.  *Id.* ¶ 8.

On June 24, 2010, Plaintiff was seen at the OCCC medical clinic for a physical assessment.  Pl.'s Ex., Doc. No. 3-12, PageID #153 (Pl.'s medical chart). There is no notation in Plaintiff's medical chart that he complained of insomnia, stress, depression, or other mental health issues.  Plaintiff says he submitted his first request regarding his perceived "need for antipsychotic prescribed medication," via the OCCC Module 3 mental health log, on June 28, 2010.[8]  *See id.,* Doc. No. 3-23, PageID #283 (Grievance No. 175194).  On July 25, 2010, Plaintiff was seen again at the OCCC medical clinic; there is no mention of

---

[8] The Module 3 mental health log is not part of the record.

insomnia or other mental health issues on his medical chart.  *Id.*, Doc. No. 3-12, PageID #153.  On August 16 and 20, 2010, Plaintiff claims that he submitted second and third requests for antipsychotic medication via the Module 3 mental health log.  *Id.*, PageID #287-88.

On August 30, 2010, the state court granted Plaintiff's motion for a three-panel psychiatric competency examination pursuant to HRS § 704-404 in his pending criminal proceedings.  *See* HPD Defs.' Ex., Doc. No. 156-1, PageID #1720.  Plaintiff pursued this motion against the advice of his defense counsel, "as a possible way of [] getting some kind of mental health assistance, whether in or out of the system."  Pl.'s Ex., Doc. No. 163-6, PageId #1901 (Robinson Report).

On September 10, 2010, Plaintiff met with OCCC psychiatrist Dr. Yamamoto.  Yamamoto Decl., Doc. No 126-2; Doc. No. 126-3 (Pl.'s OCCC medical chart).  Plaintiff reported his 2004-2005 "post traumatic stress disorder/bipolar" diagnoses.  *Id.*  Dr. Yamamoto noted that Plaintiff was primarily seeking prescription sleeping medication, specifically requesting Seroquel or Trazadone, although Plaintiff reported taking no medication in more than five years.  *Id.*  "Trazadone is a prescription anti-depressant medication and Seroquel is an antipsychotic/mood stabilizer and depression augmentation agent."  *Id.* ¶ 9.  Dr. Yamamoto further states that both of these drugs are frequently abused in Hawaii

and requested by OCCC inmates who have used them "on the streets." *Id.* Dr.

Yamamoto noted that Plaintiff displayed no depression, mania, psychosis, suicidal

or homicidal ideation, PTSD symptoms, or hallucinations, and reported no other

complaints. *Id.* He further noted that Plaintiff was employed at OCCC as a

Module clerk and there were no reported behavioral or disciplinary problems at the

prison. *Id.* After his examination and review of Plaintiff's prison records, Dr.

Yamamoto concurred with Dr. Leland that Plaintiff's clinical presentation was

inconsistent with Bipolar I Disorder or PTSD. He determined that neither

Trazadone nor Seroquel were "medically appropriate." *Id.* ¶ 7. Dr. Yamamoto's

written diagnosis was:

> Insight and judgment are limited.
> Axis I - polysubstance dependency.
> Axis II - rule out cluster B personality disorder.
> Strong Antisocial Personality disorder traits.
> Plan   1.  No medication.
>             2.  follow up as needed.

*Id.* Dr. Yamamoto "further determined that psychotherapy would not be

appropriate for [Plaintiff's] diagnosed condition." *Id.* ¶ 10. One week later, on

September 18, 2010, Plaintiff submitted another request for a psychiatric referral

seeking antipsychotic medication and treatment. Pl.'s Ex., Doc. No. 3-23, PageID

#290.

Plaintiff met with Martin Blinder, M.D., on September 20, 2010, for his first HRS § 704-404 examination. Pl.'s Ex., Doc. No. 163-6, PageID #1894-97 (Blinder Report). Dr. Blinder noted Plaintiff's history of PTSD and Bipolar I Disorder.[9] He found Plaintiff alert, oriented, relating well, with no undue anxiety, hostility, depression, hallucinations, or delusions; he opined that Plaintiff's behavior was calm, unremarkable, and appropriate. *Id.* Dr. Blinder stated, "[t]here are no stigmata of active psychosis or of organicity." *Id.*, PageID #1896. He diagnosed Plaintiff with Bipolar I Disorder, PTSD, Polysubstance abuse, and Antisocial personality disorder, but explicitly stated that Plaintiff exhibited "no Axis I diagnosis at present and is *fully capable of proceeding to trial*." *Id.*, PageID #1897 (emphasis in original). Dr. Blinder, however, was "concerned that [Plaintiff] is not receiving any treatment whatever" at OCCC. *Id.*

The next day, September 21, 2010, Plaintiff again requested a "psychiatric 'medication' assessment and evaluation." Pl.'s Ex., Doc. No. 3-23, PageID #292 (Grievance No. 175194). Plaintiff was scheduled at the OCCC psychiatric clinic on September 25, 2010, but Dr. Yamamoto cancelled the appointment, recording on Plaintiff's chart, "scheduling error. No referral.

---

[9] Dr. Blinder noted that, while he "routinely review[s] other psychiatric reports and notes, the conclusions offered here are my own, arrived independent of the work of my colleagues." Blinder Report, Doc. No. 163-6, PageID #1897.

Seen . . . few weeks ago, No need for FU." Pl.'s Ex., Doc. No. 163-7, PageID #1912.

On September 28, 2010, Plaintiff met with clinical psychologist Craig H. Robinson, Ph.D., for his second HRS § 704-404 examination. *Id.*, Doc. No. 163-6, PageID #1898-1902 (Robinson Report). Dr. Robinson diagnosed Plaintiff with PTSD, Cannabis and Amphetamine Abuse, Amphetamine Induced Mood Disorder, "with a rule out Bipolar I Disorder and Antisocial Personality Disorder," noting that "Dr. Alan Price . . . apparently made these diagnoses." *Id.* Dr. Robinson stated his diagnosis was "based on my review of records and what [Plaintiff] told me. During the actual time I interacted with [Plaintiff], there was no evidence of any significant thought, mood or personality disorder." *Id.* PageID #1899. He found Plaintiff bright, cooperative, and fit to proceed, and did not comment on the mental health care Plaintiff was receiving at OCCC. *Id.*

On October 31, 2010, Plaintiff reported at sick call with a tooth ache and was given ibuprofen. *Id.*, Doc. No. 163-7, PageID #1912. There are no notations in his medical chart concerning insomnia, other mental health issues, or a need for a psychiatric examination.

On November 5, 2010, Plaintiff met with psychologist Alex Lichton, Ph.D., for his final court-ordered examination. *Id.*, Doc. No. 163-6, PageID

#1903-10 (Lichton Report).  Dr. Lichton reviewed Plaintiff's correctional medical records, his mental health records from the state Circuit Court's Adult Client Services Branch, his pre-sentence report, and records from QMC and the Central Oahu Community Mental Health Center.  *Id.*  He noted Plaintiff's history of PTSD, but commented on "the lack of documentation of PTSD symptoms as an adult." *Id.*, PageID #1910.  Dr. Lichton found Plaintiff "presented as relatively stable with no active symptoms of major mental illness" during the examination.  *Id.*, PageID #1904.  He did not diagnose Plaintiff with Bipolar I Disorder, but rather, diagnosed Polysubstance Dependance.  He found that Plaintiff's behavior at the time of his arrest was "likely due to alcohol intoxication," and that he was competent to proceed in his criminal action.  *Id.*, PageID #1903.

On December 8, 2010, Plaintiff was seen again at OCCC sick call complaining of a toothache.  *Id.*, Doc. No. 163-7, PageID #1913.  The chart does not indicate that Plaintiff complained of insomnia or other mental health issues or requested a psychiatric appointment.  On December 13, 2010, Plaintiff filed a confidential grievance complaining, *inter alia*, of DPS Defendants' failure to provide him with an adequate mental health treatment plan.  *Id.*, Doc. No. 3-23, PageID #280-307.

On December 15, 2010, Dr. Yamamoto cancelled Plaintiff's appointment, noting a "schedule error," and "F/U as needed."  Doc. No. 163-7, PageID #1912-13.  Plaintiff does not allege he requested psychiatric appointments at OCCC after he filed his grievance and the record does not contain such requests. Plaintiff was treated for toothache at the OCCC medical clinic on December 28, 2010, and February 4, 2011.  Plaintiff's medical chart does not reflect that he complained of insomnia or sought mental health care at either appointment.

On March 14, 2011, prison officials denied Plaintiff's grievance.  *See* Pl.'s Ex., Doc. No. 96-4, PageID #161.  On March 17, 2011, Plaintiff pled no contest to Assault in the Second Degree (Count 1) and Abuse of a Family or Household Member (Count 3), in Cr. No. 1PC10-1-000729.  *See* http://hoohiki1.courts.state.hi.us/jud/Hoohiki.  The state court sentenced Plaintiff to concurrent terms of five years on Count 1 and one year on Count 3, with credit for time served.  *Id.*  The court stated, "in the event there is mental health treatment or vocational services available, that the Defendant be considered for said treatment or services."  *Id.* (Order dated Oct. 2, 2012).

Plaintiff transferred to FDC-Honolulu on or about April 20, 2011. Pl.'s Ex., Doc. No. 163-11.  He completed a Bureau of Prisons ("BOP") medical questionnaire on arrival.  *Id.*, PageID #1978-79.  Plaintiff reported having been

diagnosed with PTSD, Bipolar I Disorder, Chemical Dependency, and Antisocial

Personality Disorder. He said he took Seroquel in 2004-2005, and "seriously

considered harming" himself in 1987, 1989, and 2010. *Id.* at 1079. He alleged that

he attempted to kill himself by "[j]umping off 14 story BLDG" in 2010, referring

to the incident at issue in this suit. *Id.* He said he wanted to participate in drug

abuse treatment and was feeling "sad, tearful, depressed, tense, nervous, anxious, [

] hopeless about life[], hearing voices [and] seeing things others do not." *Id.*,

PageID #1979.

On April 21, 2011, FDC-Honolulu staff psychologist Trisha R.

Socias completed a BOP "PSIQ Review." *Id.*, PageID #2001. Plaintiff told her he

"was seeing a psychiatrist to obtain his Seroquel," had been "seeing a psychologist

once a month for the past six years," had attempted suicide three times, was

depressed, anxious, and was not sleeping well. *Id.* Plaintiff was thereafter

prescribed various medications for Bipolar I Disorder, depression, and insomnia,

including Risperdal, Trazadone, and Valproic Acid, and he attended quarterly

therapy sessions. *See generally id.* This treatment regimen has continued since

Plaintiff's transfer to HCF.

///

///

##### 2.    *Legal Standard*

Plaintiff's allegations that he experienced suicidal ideation, PTSD, and continuing mental illness satisfy the objective standard for deliberate indifference.  *See Conn*, 591 F.3d at 1095 (attempted suicide); *Sheridan v. Reinke*, 2013 WL 5437052, at *15 (D. Idaho Sept. 27, 2013) (PTSD); *Dillman v. Tuolumne Cnty.*, 2013 WL 1907379, at *11 (E.D. Cal. May 7, 2013) (same); *Bloodworth v. Krall*, 2011 WL 1043726, at *4 (S.D. Cal. Mar. 22, 2011).

To show the subjective component, Plaintiff must show that Dr. Leland and Dr. Yamamoto acted with "more than ordinary lack of due care for [his] interests or safety."  *Farmer*, 511 U.S. at 835 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).  That is, Plaintiff must show that Dr. Leland and Dr. Yamamoto acted with subjective recklessness to his serious medical needs.  *See id.* at 835-41.  "A difference of opinion between a physician and the prisoner -- or between medical professionals -- concerning what medical care is appropriate does not amount to deliberate indifference."  *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012), *overruled in part by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc) (holding monetary damages are unavailable against an official capacity defendant who lacks authority over budgeting decisions); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (finding no violation when prison doctor advised

surgery and subsequent medical personnel treated inmate but did not recommend surgery); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (holding that differing opinions between the parties' medical experts concerning the treating prison psychiatrist's choice of medication and treatment failed to show the psychiatrist acted with deliberate indifference as a matter of law).  Even proof of medical malpractice does not establish deliberate indifference.  *Snow*, 681 F.3d at 987 (citation omitted).

Rather, "to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment was medically unacceptable under the circumstances and was chosen in conscious disregard of an excessive risk to the prisoner's health."  *Toguchi*, 391 F.3d at 1058 (internal quotations marks omitted); *Snow*, 681 F.3d at 988; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

"What is necessary to establish an 'unnecessary and wanton infliction of pain,' . . . varies according to the nature of the alleged constitutional violation."  *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).  The less stringent "deliberate indifference" standard is generally appropriate in cases involving a prisoner's medical needs "because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns."  *Id.*

When a prisoner with a documented substance abuse condition demands specific antipsychotic medications, however, particularly when the medications he seeks are often abused in prison and on the streets, competing administrative concerns will obviously play a stronger factor.  Disputes like this "represent[] precisely the type of difference in medical opinion between a lay prisoner and prison medical personnel that is insufficient to establish a constitutional violation."  *Parlin v. Sodhi*, 2012 WL 5411710, at *4-5 (C.D. Cal. Aug. 8, 2012); *see, e.g.*, *Coats v. Kimura*, 2013 WL 76288, at *9 (E.D. Cal. Jan. 4, 2013) (holding that prison doctors were not deliberately indifferent when they denied a prisoner with a history of drug abuse medication known to be abused at the prison); *Arreguin v. Chin*, 2012 WL 7018236, at *4-5 (C.D. Cal. Dec. 3, 2012); *Lua v. LAC CSP Med. Officials*, 2011 WL 1743260, at *2-3 (C.D. Cal. Mar. 23, 2011) (holding that allegations that  prisoner was changed to allegedly "lesser medications" after transfer to another prison stated only a difference of medical opinion not an actionable Eighth Amendment claim); *Ricker v. Cal. Dep't of Corr.*, 2010 WL 5634316, at *2-3 (C.D. Cal. Dec. 15, 2010) (holding prisoner's claim that one prison doctor prescribed more effective pain medication than another showed only a disagreement between doctors and failed to state an Eighth Amendment violation); *Mantigal v. Cate*, 2010 WL 3365735, at *5-6 (C.D. Cal.

May 24, 2010) (holding that prison medical staff's decision to change pain medication prescribed at another institution does not constitute an actionable Eighth Amendment claim).

### 3. *Analysis -- Dr. Leland*

Dr. Leland examined Plaintiff on May 18, 2010, approximately three weeks after his arrest, for an initial intake interview. Plaintiff denied experiencing sleeping disorders, mood swings, loss of appetite, or unsociable behavior. *See* Pl.'s Ex., Doc. No. 163-7, PageID #1911. To the contrary, Dr. Leland found Plaintiff alert, cooperative, and stable. *Id.* This was consistent with Plaintiff's admission and post-admission mental health assessments, which both noted that Plaintiff displayed no observable signs of mental health needs. Plaintiff told Dr. Leland that he was taking no medication, which Dr. Leland believed was consistent with A.A.'s and Clute's drug and alcohol treatment programs, with which he was familiar. Plaintiff expressed his desire to return to these programs on release. Dr. Leland found Plaintiff's clinical presentation was inconsistent with Bipolar I Disorder. Leland Decl., Doc. No. 126-1 ¶ 5. He noted "no meds. no meds." several times on Plaintiff's chart. Doc. No. 163-7, PageID #1911. Dr. Leland had no further contact or involvement with Plaintiff at OCCC. These uncontroverted facts fail to show that Dr. Leland drew the inference that Plaintiff was at serious

risk of harm or failed to respond to such a risk. Rather, they support an inference that Dr. Leland made a considered medical decision with which Plaintiff disagrees.

Plaintiff also fails to establish that Dr. Leland's failure to prescribe him medication or therapy led to "further significant injury" or worsened his condition. *See, e.g.*, *Jett*, 439 F.3d at 1096; *Shapley v. Nev. Bd. of State Prison Comm'rs.*, 766 F.2d 404, 407 (9th Cir. 1985). Plaintiff reported no mental health issues to OCCC medical clinic personnel on June 24 and July 25, 2010. Although Plaintiff says his PTSD and Bipolar I Disorder worsened after he allegedly witnessed an inmate attempt suicide, another being treated for a gunshot wound, and two inmates scuffling, these incidents occurred nearly eight weeks after Dr. Leland examined him. They do not show that Dr. Leland's failure to prescribe the treatment he desired caused Plaintiff harm. In addition, Plaintiff began working as a Module Clerk after he met with Dr. Leland, showing that he was functioning well enough to maintain employment at OCCC.

The record also reflects that Drs. Yamamoto, Blinder, Robinson, and Lichton each independently concluded that Plaintiff exhibited no signs of Bipolar I Disorder, PTSD, psychosis, or other mental illness when they examined him after Dr. Leland. This shows that Plaintiff's condition was stable. Finally, Plaintiff submits no affidavits from any physician or mental health care provider that

controverts Dr. Leland's professional medical opinion or shows that Dr. Leland's failure to prescribe Plaintiff medication or assure he received therapy while a pretrial detainee at OCCC was medically unacceptable under the circumstances. *See Snow*, 681 F.3d at 988.  Plaintiff submits no competent evidence showing that Dr. Leland refused him medication in conscious disregard of an excessive risk to his health or caused him further significant injury.  Plaintiff simply disagrees with Dr. Leland's diagnosis concerning the care he required.  As such, Plaintiff fails to state a constitutional violation against Dr. Leland, and he is entitled to qualified immunity.

### 4.    *Analysis -- Dr. Yamamoto*

Dr. Yamamoto examined Plaintiff approximately four months later, on September 10, 2010.  *See* Pl.'s Ex., Doc. No. 163-7, PageID #1911-12.  Dr. Yamamoto's notes indicate that Plaintiff reported a history of "alcohol/methamphetamine dependency" and "post traumatic disorder/bipolar," and that he had not taken medication for more than five years.  Doc. No. 126-2, Yamamoto Decl. ¶ 7.  After interviewing Plaintiff and reviewing his correctional medical records, Dr. Yamamoto concurred with Dr. Leland that Plaintiff's clinical presentation was inconsistent with Bipolar I Disorder or PTSD.  Dr. Yamamoto further reported that Plaintiff's primary reason for visiting was to obtain a sleeping

pill, and that he specifically requested Seroquel or Trazadone. *Id.* Dr. Yamamoto

denied this request as not medically appropriate based on his personal examination

of Plaintiff as his treating psychiatrist. Specifically, Dr. Yamamoto's notes

indicate that Plaintiff had "no behavioral problems in module," "no depression,"

"no mania," "no psychosis," "no suicidal or homicidal ideation," and "no Post

Traumatic Stress Disorder signs or symptoms," that his "appetite and energy

[were] stable" and that his mental status exam revealed that he was "calm, pleasant,

well groomed, speech clear and coherent," and his mood was "ok." *Id.*

       The only evidence Plaintiff relies on in questioning Dr. Yamamoto's

medical decision is Dr. Price's 2004 diagnosis and treatment with Seroquel and his

later treatment at FDC-Honolulu and HCF. In other words, Plaintiff seeks to call

into question Dr. Yamamoto's decision in 2010 based on other doctors' medical

determinations on Plaintiff either five years before, or six months after, Dr.

Yamamoto saw Plaintiff. Needless to say, appropriate medical treatment (and, in

particular, mental health treatment) is determined based on the patient at the time

of examination, and there is a range of possible appropriate medical treatment. At

most, Plaintiff's evidence establishes only that Plaintiff's treatment changed over

time between 2004 and 2011, which is to be expected as individuals change over

time as well. These changes in Plaintiff's treatment over time do not suggest that

Dr. Yamamoto's treatment was medically unacceptable under the circumstances and/or was chosen in conscious disregard of an excessive risk to Plaintiff's health. *See Toguchi*, 391 F.3d at 1058.

Plaintiff's case is materially unlike that presented in *Snow v. McDaniel*, in which a death row prisoner complained of chronic and excruciating pain from degenerative hip disease. 681 F.3d at 982. Snow's treating prison physician, Dr. Bishop, originally prescribed only medication for his pain, but later concluded that Snow required urgent hip replacement surgery in light of his increasing pain and deteriorating condition. *Id.* at 983. Dr. Bishop opined that Snow's condition was "potentially life threatening," and referred Snow to the Nevada Department of Corrections ("NDOC") Utilization Review Panel ("URP") for surgery on several occasions. *Id.* at 983-84. The NDOC hired two independent orthopedic specialists to assess Snow's hip condition and determine whether surgery was required. *Id.* at 982-84. Both of these specialists personally examined Snow and reviewed his medical records and independently concluded that Snow required emergency hip replacement surgery to alleviate his pain and increasing immobility. *Id.* Nonetheless, the URP ignored these treating physician's opinions and relied instead on other non-treating and non-specialist prison doctors' recommendations to continue Snow's medication regime rather than approve

surgery. The NDOC continued to deny Snow surgery for more than three years as his hips degenerated and he required increasing doses of narcotics to alleviate his pain. *Id.* After Snow filed suit and was finally approved for hip replacement surgery, the district court granted the NDOC defendants' motion for summary judgment, concluding "there was merely a disagreement of opinion about the treatment of Snow with pain medications until surgery was approved." *Id.* at 985. The Ninth Circuit reversed, finding that Snow's treating prison physician's and the two independent orthopedic surgeons' opinions and recommendations provided controverted issues of fact concerning whether NDOC's decision to delay Snow's surgery showed deliberate indifference, precluding summary judgment. *Id.* at 987.

In contrast, Plaintiff provides no expert witness statements refuting Dr. Yamamoto's conclusion that Plaintiff exhibited no psychosis, PTSD, depression, or Bipolar I Disorder when he examined him in September 2010, and was an unsuitable candidate for medication. Rather, Plaintiff provides Drs. Blinder's, Robinson's, and Lichton's psychiatric reports, completed shortly after Dr. Yamamoto's examination, that each independently support Dr. Yamamoto's diagnosis.[10] They each unequivocally reported that Plaintiff was alert, cooperative,

_____

[10] These reports were produced for the state court but were not in Plaintiff's OCCC medical record or available to Dr. Yamamoto. *See* Mitchell Decl., Doc. No. 179.

and calm, showing no signs of anxiety, hostility, depression, hallucinations, or psychotic behavior.  *See* Doc. No. 163-6.  If Plaintiff required antipsychotic medication or therapy, they did not report it, although they had this prerogative.  *See* HRS § 704-404(7) (stating that "[a]ny examiner shall be permitted to make a separate explanation reasonably serving to clarify the examiner's diagnosis or opinion").  Unlike the facts of *Snow*, at most Plaintiff presents "[a] difference of opinion between a physician and the prisoner -- or between medical professionals," which does not constitute deliberate indifference.  *Snow*, 681 F.3d at 987.

Although Dr. Blinder was concerned that Plaintiff reported receiving "no treatment" at OCCC, this is at odds with Plaintiff's OCCC medical records.  *See* Doc. No. 163-6 at PageID #1896 (noting Plaintiff's statement, "I have been here six months now and have received no treatment of any kind").  To the contrary, Plaintiff had seen Dr. Yamamoto ten days before he met with Dr. Blinder, and Dr. Leland several months before that.  Plaintiff spoke with OCCC mental health worker Malcolm Lee on several occasions.  *See* Doc. No. 3-23, PageID #295 (alleging Plaintiff discussed his "need for prescribed antipsychotic medication" with Lee on at least six occasions).  Plaintiff was also seen at the OCCC medical clinic several times and apparently never reported his insomnia, alleged mental health issues, or desire for mental health care at any of these visits.  And, although

Dr. Yamamoto canceled two appointments with Plaintiff, he specifically ordered "F/U as needed" on both occasions. *See* Doc. No. 163-7, PageID #1914. This does not support an inference of deliberate indifference. While Dr. Blinder's statement suggests that he disagreed with Plaintiff's alleged lack of treatment, he also stated that Plaintiff was "not an immediate danger to himself or others," but worried that absent treatment Plaintiff might get into difficulty again. Pl.'s Ex., Doc. No. 163-6, PageID #1897. Dr. Blinder's opinion that Plaintiff should receive unspecified treatment does not prove that Dr. Yamamoto acted with deliberate indifference. *See Snow*, 681 F.3d at 987.

Plaintiff does provide his FDC-Honolulu and HCF medical records showing he received medication and therapy after he was convicted in 2011 and left OCCC. But he submits no declarations from his FDC-Honolulu or HCF treating physicians refuting or even disagreeing with Dr. Yamamoto's medical conclusions. Nor do they show that he suffered further significant injury while at OCCC. Even if the court could consider Plaintiff's FDC-Honolulu and HCF medical charts as expert opinion evidence, they do not support Plaintiff's argument. At best, they show that different prison mental health providers who treated Plaintiff at divergent times had differing opinions about the type and degree of treatment he required. *See Toguchi*, 391 F.3d at 1055-56. This type of

disagreement between medical providers fails to establish a constitutional deprivation under the Eighth Amendment. *Id.* at 1061.

Having carefully reviewed the parties' evidence and arguments, the court finds that Plaintiff has not raised a genuine issue for trial with respect to whether DPS Defendants acted with deliberate indifference to his mental health needs. Although Plaintiff disagrees with DPS Defendants' diagnoses and failure to provide him with medication or therapy while he was at OCCC, the record shows only that over the course of several years Plaintiff's treatment and diagnoses evolved over time based on many physicians' and psychologists' considered evaluation of his symptoms and responses to treatment. DPS Defendants reasonably responded to Plaintiff's mental health needs in light of his clinical presentation.

In sum, Plaintiff presents no evidence that DPS Defendants Dr. Leland's and Dr. Yamamoto's care was medically unacceptable, *Toguchi*, 391 F.3d at 1058, or that they acted with a "sufficiently culpable state of mind" to establish deliberate indifference to his serious mental health needs. *See Farmer*, 511 U.S. at 847. Accordingly, DPS Defendants Dr. Leland and Dr. Yamamoto's Motion for Summary Judgment is GRANTED.

**F.      The Court Declines Supplemental Jurisdiction**

To the extent Plaintiff alleges a state law negligence or medical malpractice claim against Dr. Leland and Dr. Yamamoto, the court declines to exercise supplemental jurisdiction over such claims. *See* 28 U.S.C. § 1367(c)(3).

## V.  <u>CONCLUSION</u>

1.  Honolulu Police Department Defendants Tyler Maalo, Nathan Patopoff, William Daubner, Oscar Willis, and Randall Rivera's Motion for Summary Judgment is GRANTED.

2.  Plaintiff's Motion for Partial Summary Judgment is DENIED as moot.

3.  Department of Public Safety Defendants Tom W. Leland, M.D., and Peter Y. Yamamoto, M.D.'s Motion for Summary Judgment is GRANTED.

4.  The court declines to exercise supplemental jurisdiction over any remaining state law claims.[11]  The Clerk of Court is DIRECTED to enter judgment

///

///

///

---

[11]  28 U.S.C. § 1367(d) provides that "[t]he period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

and terminate this action.

    5.  All pending motions are DENIED.

        IT IS SO ORDERED.

        DATED:  Honolulu, Hawaii, April 28, 2014.



                                        /s/ J. Michael Seabright
                                        J. Michael Seabright
                                        United States District Judge

*Kamakeeaina v. City & Cnty, et al.*, Civ. No. 1:11-00770 JMS-RLP; J:\Denise's Draft Orders\JMS\2Kamakeeiana 11-770 jms (Apr. 25).wpd